TRI-STATE MILL SUPPLY COMPANY v. PROCESS ENGINEERING, INC. AND PEOPLES LOAN & INVESTMENT COMPANY

5-4095                                    414 S. W. 2d 94

Opinion delivered April 24, 1967
[Rehearing denied May 15, 1967.]

*Wright, Lindsey & Jennings*, for appellant.

*Edgar A. Woolsey Jr.* and *Jeta Taylor* and *Harper, Harper, Young & Durden*, for appellee.

J. FRED JONES, Justice. Tri-State Mill and Supply Company sued Process Engineering, Inc., J. D. Sanders, Ozark Sales & Service Company and Peoples Loan & Investment Company in the Circuit Court of Franklin County. The case was transferred to Chancery.

Tri-State sought a money judgment against Process in the amount of $41,217.63 for materials sold on open account. It sought a materialman's lien paramount to

a mortgage held by Peoples Loan on the property involved. Peoples cross claimed for foreclosure of its mortgage, and Tri-State answered with the affirmative defense of usury.

The trial court dismissed the complaint of Tri-State as to Process; entered a decree in favor of Peoples Loan for $11,524.29 and ordered foreclosure of the mortgage security. Tri-State has appealed.

In this case either Tri-State or Process must suffer a loss because Sanders, a Tri-State salesman, succeeded in obtaining from Tri-State materials that were charged to Process but used by Sanders in ventures undertaken by him for his own benefit. Fundamentally the issue is whether, on the one hand, Sanders had such apparent authority to act for Tri-State that Process was justified in not questioning the purchases charged to Process' account with Tri-State, or, on the other hand, Sanders' course of dealing was so indicative of bad faith that Process should have attempted to ascertain the extent of his actual authority. The controlling principles of law are not in issue. See *Hill* v. *Delta Loan & Finance Co.*, 224 Ark. 785, 277 S. W. 2d 63 (1955), and *McCarroll Agency* v. *Protectory for Boys, etc.*, 197 Ark. 534, 124 S. W. 2d 816 (1939).

Tri-State Mill Supply Company is a corporation engaged in the business of manufacturing and selling mill supplies of all kinds including steel buildings and steel chicken houses made to order. Tri-State has its principal place of business in Arkansas, and makes its sales to customers through individual commission salesmen operating out from its branch offices in Arkansas. Tri-State obtains from "vendors" such items its customers demand, which are not manufactured by Tri-State or held in stock by it in warehouses.

Process Engineering, Inc. is a corporation with its principal place of business in Oklahoma. Process is engaged in the business of prefabricating and erecting steel buildings, including feed mills and chicken houses.

The designing and preparation of plans and specifications and the erection of buildings and installation of equipment and machinery according to plans and specifications, seem to be the principal business of Process. A Mr. Stone is the president and general manager of Tri-State, and Mr. Ellis is president and general manager of Process.

About 1961, one James D. Sanders had gone broke in the contracting business in another state, and upon his return to Arkansas he was employed as a salesman for Tri-State by Mr. Stone. Mr. Stone and Sanders had been boyhood friends, and it appears that the usual investigation as to background and integrity was waived in Mr. Sanders' case when he was employed by Tri-State and Mr. Sanders was assigned to Northwest Arkansas working out of the Conway branch office of Tri-State.

Tri-State and Process had done considerable business with each other on a rather loose but mutually satisfactory basis until Sanders went to work for Tri-State in 1961. Soon after Sanders went to work for Tri-State, Mr. Ellis was invited to a sales meeting held by Tri-State in Pine Bluff, at which time he was introduced to the Tri-State salesmen and his business was solicited by Tri-State and he was assured that Tri-State salesmen were of the highest integrity and that their words could be relied upon.

It appears that the business conducted by Tri-State, as related to the business of Process, and the benefits one expected to derive from the services of the other, were brought about and carried on in this manner: The salesmen for Tri-State would sell a completed building (turn key job) to be erected where the purchaser wanted it. Tri-State would make its profit on the sale of a completed building, the salesman would receive his commission from Tri-State, and to avoid the appearance of being in competition with other contractors who purchased their materials from Tri-State, Process would actually prepare the plans and specifications for buildings sold

by Tri-State, and insofar as other contractors were concerned, Process was an independent contractor who was just another customer of Tri-State. Insofar as the purchaser was concerned, Process was a subcontractor or a part of Tri-State, and insofar as Tri-State and Process were concerned, their actual relationship is not clear from the record. In any event, the materials for the jobs contracted by Tri-State were billed out to Process. When Process needed materials for its own separate jobs, it purchased these materials from Tri-State. When a job was completed, or at convenient intervals, Tri-State and Process would balance their accounts and settle any difference.

After Sanders went to work for Tri-State, he sold a grain elevator to Arkansas Valley Industries to be erected in Mississippi. He arranged with Mr. Ellis for Process to design and actually erect the building, and all materials were billed out to Process as if Process was an independent contract customer and had procured the contract itself and was merely purchasing the materials from Tri-State. Mr. Ellis settled up with Tri-State upon completion of this job and no controversy arose. The materials for this job were billed out to Process, although the construction was procured by Sanders representing Tri-State.

The record in this case contains considerable testimony to the effect that after Sanders was employed by Tri-State, Tri-State further extended its interest into the actual construction and installation of the buildings and machinery it sold to owner customers, and in order to keep it from appearing that Tri-State was competing with its contractor customers in the erection of buildings and installation of machinery, Tri-State would bill the materials out to Process, making it appear that Process was the actual customer, when in fact the final purchaser of the building or machinery was the customer of Tri-State, the inference being that through billing the materials out to Process, Tri-State would reap the benefits of the profits on the *erection* of the building and in-

stallation of the machinery, as well as the mark-up profits on the materials sold, thus putting Tri-State actually in competition with other contractors who sold "turn key" building jobs to individuals and purchased the materials from Tri-State.

As a matter of fact it would appear from the record that this procedure may well have been Sanders' idea and primarily initiated by him. The record would also indicate that if Tri-State did not encourage the procedure, it did nothing to discourage it when it knew, or should have known, that this procedure was being carried out by Sanders especially through Process.

In regard to the job in Mississippi, Mr. Stone testified as follows:

"Q. Can you briefly describe the transaction between Tri-State and AVI?

A. It was a sales agreement. Now the reason I recall it so vividly, the reason is we had our legal counsel draw up the sales agreement. We were studiously not entering into a contract. It was a sales agreement whereby we would furnish this grain elevator for a specified price. Now, we were going to buy this thing and erect it by Process for a specified price.

Q. You say you had your legal counsel examine this document.
Why?

A. We don't go into contracting. We don't do contracting work as contractor.
\* \* \*

Q. What did your contract with AVI provide then?

A. We agreed to sell AVI this equipment installed

by Process at their plant in Greenville per specification for a given price.

\* \* \*

Q. Did you ever see a written agreement between Sanders purportedly on behalf of Tri-State and Process? Or was all of this oral as far as you were concerned?

A. I don't recall seeing such an agreement. I cannot at the same time say there isn't any.

Q. So far as your were concerned, is it your understanding that Process was purchasing certain material from you on that particular job?

A. Well, the understanding is, or it was my interpretation of the understanding that we were actually selling the job to AVI. We were in turn buying it from Process. But because we were able to sell this particular job, Process was going to buy whatever materials they needed that we handled to do the job with from us.

\* \* \*

THE COURT: This is cross examination.

Q. Why were you studiously avoiding the contract?

A. We are not in the contracting business, and we don't have a contractor's license.

Q. You would be competing with your customers, would you not?

A. That is true.

Q. And wouldn't want to do that directly?

A. No, sir.

Q. But you did make this contract through Jim Sanders yourself and allow Process Engineering to perform it as if they were purchasing the material from you. Is that not a fair statement of that situation? Isn't that why you avoided the contract directly?

A. Well, we avoided the contract directly for the reasons I just gave you. This was a sales agreement between Tri-State and AVI duly drawn up by legal counsel. Now, we did buy the job from Process Engineering through our contract.

Q. Did they agree to install your material?

A. They agreed to do the job. At the same time they agreed to buy from us whatever materials they might need in the job that we had to sell.

Q. Hadn't Jim Sanders already arranged for the job, as a matter of fact, before this contract?

A. Well, he had been in contact with the customer and had gotten it up to a point of sale.

Q. Had he not signed an agreement in Tri-State's name, and didn't you later back up that agreement?

A. No, sir.

Q. He had signed no agreement? Is that your testimony?

A. I am not saying that. I am trying to recall exactly. He may have signed a document which we voided and so notified the customer.

Q. But it was performed, was it not?

A. We voided it.

Q. You tore up the document but you performed the contract, didn't you?

A. We replaced it with a sales agreement.

Q. That you signed yourself?

A. That is right.

Q. But you went ahead on the same practice and pattern he had in actual fact outlined for your company, didn't you? You backed his agreement in practice and in fact?

A. We backed up his sales, we sure did.

Q. All the way?

A. Yes, sir.''

We do not say that this procedure was legally, morally or even ethically wrong, but it is obvious from the record that this procedure placed Sanders in a position to perpetrate the fraud he obviously perpetrated according to the record in this case.

While acting as a salesman for Tri-State in Northwest Arkansas, Sanders simply started selling chicken houses to farmers, ordering the materials from Tri-State, charged or billed out to Process, and delivered to the farm of the purchaser where they were erected under the supervision of Sanders, and in some instances with the assistance of Process from whom he also purchased some items of material. Sanders collected from the farmers, paid enough on his personal account for materials and labor to Process to keep his credit good with Process, and finally sold a $9,500.00 chicken house to a farmer near Ozark, ordered the chicken house from Tri-State on Process' account, took a deed to 76.25 acres of land in payment for the chicken house and built three more chicken houses for himself on the land so purchased. He purchased the materials for his own three chicken houses from Tri-State, had the materials charg-

ed to Process, and then borrowed $16,211.49 from Peoples Loan & Investment Company, mortgaging the land with the new chicken houses thereon to Peoples as security for the loan should he live, and taking out a life insurance policy through Peoples as additional security for the loan should he die.

Sanders ordered most of the materials he purchased from Tri-State through the Tri-State Conway office. He not only ordered and obtained delivery of the materials on Process' account without question from Tri-State or Process, he dictated the mark-up to be charged, or profits to be derived by Tri-State, on the items purchased. On several occasions Sanders sold materials for Tri-State and then exceeded his authority by purchasing the materials direct from "vendors" on Tri-State's account, and Tri-State "backed him up."

Mr. Jerry Wayman, manager of the Tri-State Conway branch, testified as follows:

"Q. Who prepared the total figure in the bill on the invoice? Where did that total come from?

A. The total bill for Process?

Q. Yes.

A. I would have totaled the invoices from vendors, the delivery tickets from stock, and *Mr. Sanders would tell me how much to add on what he had sold the job for.*

Q. What do you mean, how much to add?

A. *What percentage of profit to make.* In other words, he would tell me how much he had sold that job for.

Q. Now, just looking at the delivery tickets and the purchase orders of vendors, what figures are shown there?

A.  Cost figures only.

Q.  Those are strictly cost figures?

A.  That is correct.

Q.  Then the add on for profit?

A.  Yes, sir.

Q.  *Is there a standard add on every job, such as five per cent or ten per cent for mark-up.*

A.  *No, sir.*

Q.  *What did you rely upon Mr. Sanders for then —to give you the percentage mark-up?*

A.  *That is correct.*

Q.  *Was the customer aware of the percentage mark-up to be charged on a job?*

A.  *I don't know, sir. My information came from Sanders.*

Q.  *Sanders.*

\* \* \*

A.  ...that is a ticket that we use to ship something from our warehouse to a customer.

Q.  In other words, you make this up yourself?

A.  Yes, sir. It is a printed form and we fill in this part.

Q.  Who does it show this material was sold to?

A.  That is a memo shipping ticket that says that it was shipped to Tri-State at Conway.

Q.  That says it was sold to you?

A.  Yes, sir.

Q. Sold to Tri-State at Conway?

A. Yes, sir.

Q. Who does it say it is shipped to?

A. Jim Sanders.'' (emphasis supplied)

Mr. Ellis of Process testified that when he received the billings from Tri-State on the materials purchased by Sanders for the chicken houses:

> "I discussed the matter with the people involved and was assured that this was being carried on in the same manner in which we had worked with Tri-State before. As for lack of a better name, as a third party in their negotiation. We had been requested by Mr. Stone and by the people at Tri-State to operate in this manner, and in turn bought certain materials and services from us. We had operated in that manner prior to this time. All negotiations had been open and above-board. Our relations had been excellent with this group of people."

Sanders formed a corporation, Ozark Sales & Service Company which was made party defendant in this case, but Sanders' luck ran out before his corporation got underway, and Sanders wound up in bankruptcy owing Process $25,400.70 for materials and service purchased *from* Process, and owing Tri-State $41,217.63 for materials he purchased *for* Process, and owing Peoples Building and Loan $11,524.29 for borrowed money secured by a mortgage and a life insurance policy with the premiums prepaid.

Sanders exchanged a $9,500.00 chicken house for the 76.25 acres of land, he built three other chicken houses on this land and then transferred it to Tri-State by warranty deed impressed with a mortgage to Peoples in the balance amount of $14,995.68.

The appellant contends that the loan from Peoples Loan and Investment Company to Sanders was usurious and the mortgage lien void. This contention is based upon the allegation that Sanders was required to take out term life insurance as a prerequisite to obtaining the loan. The record shows the life insurance was obtained upon a separate application. Without the inclusion of the premiums paid, the loan would not be usurious. Since this issue turns upon whether or not Sanders was forced to carry the life insurance as a prerequisite to obtaining the loan, the chancellor's finding to the effect that Sanders was not forced to carry the life insurance is not contrary to a preponderance of the evidence.

We have diligently searched the briefs and the entire record and have found nothing which we feel was overlooked by the chancellor in this case. The chancellor was confronted with a fact question presented on conflicting testimony, and we are unable to say that the findings of the chancellor were clearly against the preponderance of the evidence.

The decree of the chancellor will be affirmed.

Affirmed.